**UNDER SEAL**

**COPY**

AO 91 (Rev. 11/82)                                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>**DZUNG AHN PHAM** | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**SA 18 - 6 5 2 M** |
|---|---|

Complaint for violation of Title 21 U.S.C. 841(a)(1), (b)(1)(C)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE AUTUMN D. SPAETH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|

| DATE OF OFFENSE<br>August 4 and 27, 2018 | PLACE OF OFFENSE<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about the following dates, in Orange County, within the Central District of California, and elsewhere, defendant DZUNG AHN PHAM, then a physician licensed to practice medicine in the State of California, while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, knowingly and intentionally prescribed and distributed oxycodone, a Schedule II narcotic drug controlled substance, in the name and date of birth of R.C.:

| COUNT | DATE |
|---|---|
| ONE | August 4, 2018 |
| TWO | August 27, 2018 |

in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C).

FILED
CLERK, U.S. DISTRICT COURT
DEC 17 2018
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

BASIS OF COMPLAINT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**LINDSEY M. BELLOMY**        /S/<br><br>OFFICIAL TITLE<br>Special Agent, Drug Enforcement Administration |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>AUTUMN D. SPAETH | DATE<br>12-17-18 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA BSagel:lb          REC: Detention

LODGED
DEC 17
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
SANTA ANA

## AFFIDAVIT

I, Lindsey Bellomy, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since December 2010.  I am currently assigned to the Los Angeles Field Division, Orange County Resident Office ("OCRO").  At OCRO, I am assigned to the Tactical Diversion Squad.  During my tenure with DEA, I have received comprehensive, formalized instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques.  I have participated in numerous investigations into the unlawful importation, manufacture, and distribution of controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses.  In conducting these investigations, I have utilized a variety of investigative techniques and resources, including surveillance, confidential source debriefings, telephone toll analysis, and wire communications analysis.

1

2.     Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I have become familiar with the tactics and methods used by traffickers to smuggle and safeguard pharmaceutical controlled substances, to distribute and divert pharmaceutical controlled substances, and to collect and launder the proceeds from the sale of controlled substances.  Further, I am aware of the tactics and methods employed by pharmaceutical trafficking organizations and individuals to thwart investigation of their illegal activities.

3.     Through my investigations, my training and experience, and my conversations with other law enforcement personnel, I and other law enforcement personnel have spoken on numerous occasions with pharmacists, physicians, DIs, Medical Board investigators, patients, and other witnesses having extensive knowledge of pharmaceuticals regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances.

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this

2

matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

5.    This affidavit is made in support of a criminal
complaint against Dzung A. PHAM ("PHAM") for violations of 21
U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

## A.    Summary of affidavit

6.    Dzung Ahn PHAM, D.O. ("PHAM"), is a licensed medical
doctor with an office located at 15435 Jeffrey Road, Unit 127,
Irvine, California.  PHAM sees "patients" at this location on
Monday, Tuesday, Thursday, Friday, and Saturday.

7.    Based on, among other things, information obtained
from interviews, a review of PHAM's prescribing history, an
undercover investigation, and a medical expert's review of the
investigation, there is probable cause to believe that PHAM is
distributing controlled substances outside the usual course of
professional practice and without a legitimate medical purpose,
laundering the proceeds of his distribution of controlled
substances.  As a result, highly addictive and dangerous
controlled substances, including oxycodone, hydrocodone,
amphetamines, and alprazolam, among others, have been diverted
from legitimate medical use into the community for illegitimate
use.  Furthermore, as described below and specific to the
charges in the criminal complaint, PHAM prescribed controlled
substances to "patients" who were addicts and also prescribed

3

controlled substances in the name and date of birth of an individual related to a "patient" of PHAM's to further distribute controlled substances.  Specifically, on or about August 4, 2018, and August 27, 2018, PHAM prescribed oxycodone HCL 30-MG to R.C., the wife of PHAM's patient T.C.; R.C. has never seen PHAM as a patient.

**B.    Target of the investigation**

8.    Dzung Ahn PHAM, D.O.: As is described in further detail below, evidence shows that PHAM is selling, primarily for cash, prescriptions for controlled substances to individuals, which prescriptions are outside the usual course of professional practice and without a legitimate medical purpose.

a.    PHAM is registered with DEA at Irvine Village Urgent Care, 15435 Jeffrey Road #127, Irvine, California, and has a current DEA registration number: BP3274254.  A DEA registration number is required for ordering, storing, administering, and/or dispensing controlled substances.

b.    PHAM is also a detoxification doctor, *i.e.*, a doctor authorized with a waiver under the provisions of the Drug Addiction Treatment Act of 2000 to prescribe controlled substances to patients for addiction/dependence treatment (a "DATA waived physician").  PHAM is registered with DEA as a DATA waived physician at Irvine Village Urgent Care, 15435 Jeffrey Road #127, Irvine, California, under DEA # XP3274254.

i.    DATA waived physicians may treat narcotic dependence with Schedule III, IV, and V narcotic controlled substances, provided those drugs have been approved by the Food

4

and Drug Administration ("FDA") specifically for use in addiction maintenance or detoxification treatment.  Currently, the only approved medication for addiction treatment is buprenorphine (brand name Suboxone, Subutex), a Schedule III controlled substance.

        ii.     The practitioner must be a "qualifying physician," meaning he is licensed under state law and has specific medical certification, training, or experience in maintenance or detoxification treatment as specified in the Controlled Substances Act.

## C.  Overview of the law and policy regarding prescription medication

      9.    Based on my training and experience, and information obtained from other law enforcement personnel, I know that the distribution of controlled substances must meet certain federal rules and regulations.  Specifically, I know the following:

        a.   21 U.S.C. § 812 establishes schedules for controlled substances that present a potential for abuse and the likelihood that abuse of the drug could lead to physical or psychological dependence.  Such controlled substances are listed in Schedule I through Schedule V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence.  Controlled substance pharmaceuticals are listed in Schedules II through V because they are drugs for which there is a substantial potential for abuse and addiction.  There are other drugs available only by prescription but not classified as controlled substances.  Title

21 of the Code of Federal Regulations, Part 1308, provides
further listings of scheduled drugs.

      b.   Pursuant to 21 U.S.C. § 822, controlled
substances may only be prescribed, dispensed, or distributed by
persons registered with the Attorney General of the United
States to do so (with some exceptions, such as delivery
persons).  The Attorney General has delegated to the DEA
authority to register such persons.

      c.   Under 21 U.S.C. § 823(f), DEA-registered medical
practitioners (including pharmacies, *see* 21 U.S.C. § 802(21))
must be specifically authorized to handle controlled substances
in any jurisdiction in which they engage in medical practice.

      d.   21 C.F.R. § 1306.04 sets forth the requirements
for a valid prescription.  It provides that for a "prescription
for a controlled substance to be effective [it] must be issued
for a *legitimate medical purpose* by an individual practitioner
*acting in the usual course of his professional practice.*  The
responsibility for the proper prescribing and dispensing of
controlled substances is upon the prescribing practitioner, but
a corresponding responsibility rests with the pharmacist who
fills the prescription."  (Emphases added.)

      e.   21 C.F.R. § 1306.05 sets forth the manner of
issuance of prescriptions.  It states that "[a]ll prescriptions
for controlled substances shall be dated as of, and signed on,
the day when issued and shall bear the full name and address of
the patient, the drug name, strength, dosage form, quantity
prescribed, directions for use and the name, address, and

registration number of the practitioner."

       f.   21 C.F.R. § 1306.12 governs the issuance of multiple prescriptions and states: "An individual practitioner may issue multiple prescriptions authorizing the patient to receive a total of up to a 90-day supply of a Schedule II controlled substance provided the following conditions are met:

       i.   Each separate prescription is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice;

       ii.   The individual practitioner provides written instructions on each prescription (other than the first prescription, if the prescribing practitioner intends for that prescription to be filled immediately) indicating the earliest date on which a pharmacy may fill each prescription;

       iii.   The individual practitioner concludes that providing the patient with multiple prescriptions in this manner does not create an undue risk of diversion or abuse;

       iv.   The issuance of multiple prescriptions as described in this section is permissible under the applicable state laws; and

       v.   The individual practitioner complies fully with all other applicable requirements as well as any additional requirements under state law."

       g.   California Health and Safety Code § 11172 states: "No person shall antedate or postdate a prescription."

       h.   21 U.S.C. § 841(a)(1) makes it an offense for any person to knowingly and intentionally distribute or dispense a

controlled substance except as authorized by law.  Distribution
of a scheduled controlled substance in violation of 21 U.S.C.
§ 841(a)(1) by a medical doctor (often referred to as
"diversion") occurs when a medical doctor knowingly and
intentionally prescribes a controlled substance, knowing the
drugs were controlled, for a purpose other than a legitimate
medical purpose and outside of "the usual course of professional
practice." *See United States v. Moore*, 423 U.S. 122, 124 (1975)
("We . . . hold that registered physicians can be prosecuted
under 21 U.S.C. § 841 when their activities fall outside the
usual course of professional practice."); *see also United States
v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006) ("[T]o convict
a practitioner under § 841(a), the government must prove
(1) that the practitioner distributed controlled substances,
(2) that the distribution of those controlled substances was
outside the usual course of professional practice and without a
legitimate medical purpose, and (3) that the practitioner acted
with intent to distribute the drugs and with intent to
distribute them outside the course of professional practice.").

D.    **Overview of the standard of care in pain management**

10.   The Medical Board of California formally adopted a
policy statement entitled, "Prescribing Controlled Substances
for Pain."  The Medical Board's guidelines for prescribing a
controlled substance for pain state that the practitioner must
obtain a medical history and conduct a physical examination.

Such history and exam include an assessment of the pain and physical and psychological function; substance abuse history; prior pain treatment; assessment of underlying or coexisting diseases and conditions; and documentation of the presence of a recorded indication for the use of a controlled substance.

11.   California Business and Professions Code, Section 2242(a), states that there must be a logical connection between the medical diagnosis and the controlled substance prescribed: "Prescribing, dispensing, or furnishing dangerous drugs . . . without an appropriate prior examination and a medical indication, constitutes unprofessional conduct."  A practitioner must make "an honest effort to prescribe for a patient's condition in accordance with the standard of medical practice generally recognized and accepted in the country."  *United States v. Hayes*, 794 F.2d 1348, 1351 (9th Cir. 2006).

**E.   Overview of pharmaceutical investigations**

12.   There is no statutory or regulatory definition of the phrase "outside the usual course of professional practice"; however, case law has provided guidance in this area.  "The term 'professional practice' refers to generally accepted medical practice; a practitioner is not free deliberately to disregard prevailing standards of treatment." *United States v. Vamos*, 797 F.2d 1146, 1151 (2nd Cir. 1986).  However, "the standard for criminal liability under § 841(a) requires more than proof of a doctor's intentional failure to adhere to the standard of care." *Feingold*, 454 F.3d at 1011.  Criminal prosecution requires "proof beyond a reasonable doubt that the doctor was acting

9

outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting in the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, *i.e.,* the personal profit of the physician." *Id.*, *quoting United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137 (4th Cir. 1994).

13.    Courts have generally recognized several factors evidencing that a physician's behavior was without a legitimate medical purpose and outside the usual course or scope of professional practice, examples of which include the following:[1]

a.    The physician prescribed or dispensed an inordinately large quantity of controlled substances.

b.    The doctor issued large numbers of prescriptions.

c.    The patient received no or a very cursory physical examination.

d.    The physician advised the patient to fill prescriptions at different pharmacies.

e.    The doctor prescribed controlled substances at intervals inconsistent with legitimate medical treatment.

f.    The physician used street slang rather than medical terminology for the drugs prescribed.

g.    No logical relationship existed between the drugs prescribed and the treatment of the alleged condition.

h.    The physician wrote more than one prescription in

---

[1]    *See, e.g., United States v. Rosen*, 582 F.2d 1032, 1035 (5th Cir. 1978).

order to spread them out.

14.   In addition, the medical expert consulted in this investigation, Dr. Timothy Munzing, M.D., set forth specific criteria to consider when determining if a physician acted within the scope of professional practice.  According to Dr. Munzing, in a pain management practice, a physician must have:

a.   adequately evaluated the patient and used good judgment in developing a treatment plan;

b.   practiced periodic clinical reviews;

c.   obtained or contemplated specialty consultation;

d.   kept and maintained complete and accurate medical records;

e.   developed a working diagnosis and maintained a differential diagnosis;

f.   offered alternative therapies and approaches to treating the disorder;

g.   reviewed previous medical records, diagnostic work-up, and medical therapy;

h.   developed a plan of action for future diagnostic evaluation;

i.   developed a future plan of treatment; and

j.   recorded objective measurements of pain levels, functional abilities, and emotional and psychological status.

**F.**   **The controlled substances discussed in this affidavit**

15.   Based on my training and experience, and information obtained from other law enforcement personnel, I know the following about the controlled substances discussed often

11

throughout this affidavit:

a.    Oxycodone (brand name OxyContin, Percocet, Roxicodone) is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic controlled substance.  Oxycodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of moderate to severe pain.  Oxycodone is sometimes referred to as "synthetic heroin" or "hillbilly heroin," and the effects, addiction, and chemical composition of oxycodone are extremely similar to heroin.  An oxycodone prescription is generally issued for a modest number of pills to be taken over a short period of time because of the potential for addiction. OxyContin is a time-released formulation available in several strengths between 10mg and 80mg per tablet, designed for absorption into the system over the course of 10 to 12 hours. OxyContin was approved for use in 1996, and, by 2001, OxyContin was the largest grossing opiate pain reliever in the United States.  In 2010, because of public pressure, the manufacturer reformulated OxyContin to make it more difficult to snort, smoke, or otherwise abuse, and changed the markings on the pill from "OC" to "OP" to differentiate the newer tamper-proof version.  Roxicodone is an immediate-release formulation available in 5mg, 15mg, and 30mg tablets.  Because of the immediate-release component, the potential for overdose and death with Roxicodone is exponentially higher than OxyContin, even though the tablet strength is less.  The street slang for Roxicodone is "Roxy."  Oxycodone in either formulation is

extremely addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. Oxycodone typically has a street value of $10 to $15 per 30mg tablet in the greater Los Angeles area.

b.    Hydrocodone (Vicodin, Norco, and Lortab), also prescribed as hydrocodone bitartrate-acetaminophen, is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance. Hydrocodone, when legally prescribed for a legitimate medical purpose, is typically used for the relief of mild to moderate pain. Accordingly, the prescription is generally for a modest number of pills to be taken over a short period of time. Hydrocodone is formulated in combinations of 5 to 10mg of hydrocodone and 325 to 750mg of acetaminophen. Hydrocodone can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. Hydrocodone typically has a street value of $3 per 10mg tablet in the greater Los Angeles area.

c.    Alprazolam (Xanax) is a generic name for a Schedule IV benzodiazepine prescription drug. When used for a legitimate medical purpose, it is prescribed to treat such conditions as anxiety, depression, and panic disorder. Alprazolam comes in the following strengths: 0.25mg, 0.5mg, 1mg, and 2mg. The 2mg tablets are rectangular and often referred to on the street as "bars" or "zanny bars." Alprazolam can be addictive and is a commonly abused controlled substance that is diverted from legitimate medical channels. Alprazolam typically has a street value of $2 to $4 per tablet in the greater Los

13

Angeles area.

d.   "Amphetamine salts" (Adderall) is a generic name for a stimulant classified under federal law as a Schedule II controlled substance.  It is also referred to as dextroamphetamine saccharate and dextroamphetamine sulfate. Amphetamine salts, when legally prescribed for a legitimate medical purpose, are typically used to control Attention Deficit Hyperactivity Disorder ("ADHD").  Amphetamine salts are formulated in oral tablet strengths of 5mg, 7.5mg, 10mg, 12.5mg, 15mg, 20mg, and 30mg.  Amphetamine salts are also formulated into extended release strengths of 5mg, 10mg, 15mg, 20mg, 25mg, and 30mg per tablet.  Amphetamine salts can be addictive. Adderall is a commonly abused controlled substance that is often diverted from legitimate medical channels.  The short-acting form of amphetamine salts (versus extended release) is more likely to be diverted and abused.  Amphetamine salts are sometimes diverted away from legitimate medical use to be abused as an appetite suppressant (as are other amphetamines) and by college students who take the drug to stay awake and study. Amphetamine salts typically have a street value of $10 per tablet in the greater Los Angeles area.

e.   Carisoprodol (Soma) is a prescription drug marketed since 1959.  It is a centrally acting muscle relaxant. The diversion and abuse of carisoprodol have increased in the last decade.  Carisoprodol, when legally prescribed for a legitimate medical purpose, is used as an adjunct to rest, physical therapy and other measures for relief of acute, painful

14

musculoskeletal conditions.  It is available as single-entity
tablets containing 250-mg or 350-mg carisoprodol, and as
combination tablets containing 200-mg carisoprodol, 325-mg
aspirin and 16 mg codeine phosphate.  The standard dosage for
adults is 250-mg to 350-mg three times daily and at bedtime.
Use in patients under age 12 is not recommended.  According to
IMS Health™, there were approximately 8.5 million carisoprodol
products dispensed in the U.S in 2013.  According to the
Diversion Drug Trends, published by the DEA on the trends in the
diversion of controlled and non-controlled pharmaceuticals,
carisoprodol continues to be one of the most commonly diverted
drugs.  Diversion and abuse of carisoprodol is prevalent
throughout the country.  As of March 2011, street prices for
Soma ranged from $1 to $5 per tablet.  Diversion methods include
doctor shopping for the purpose of obtaining multiple
prescriptions and forging prescriptions.  As of January 11,
2012, carisoprodol is a schedule IV controlled substance under
the Controlled Substances Act.

      f.   Tramadol was approved for marketing in the United
States as a non-controlled analgesic in 1995 under the trade
name of Ultram®.  Soon after its approval, however, there were
reports of diversion and abuse of tramadol.  This led to FDA
revisions to the product labeling and the addition of warnings
about its abuse.  Tramadol is an opioid analgesic and opioid
activity is the overriding contributor to its pharmacological
effects.  Abuse and adverse events of tramadol are similar to
those of other opioid analgesics. Tramadol is approved for the

treatment of moderate to moderately severe pain in adults. Tramadol is most commonly abused by narcotic addicts, chronic pain patients, and health professionals. According to the American Association of Poison Control Centers, there were 12,108 tramadol exposures in 2016. Of this total in 2016, there were 5,712 single substance exposures and 3 associated deaths. According to the National Survey on Drug Use and Health (NSDUH) in 2016, 1.6 million people in the U.S. aged 12 or older misused tramadol products in the past year. Tramadol is controlled in Schedule IV of the Controlled Substances Act.

g.   Buprenorphine hydrochloride, also called buprenorphine, was first marketed in the United States in 1985 as a schedule V narcotic analgesic. Initially, the only available buprenorphine product in the United States had been a low-dose (0.3 mg/ml) injectable formulation under the brand name, Buprenex®. Diversion, trafficking and abuse of other buprenorphine products have occurred in Europe and other areas of the world. In October 2002, the FDA approved two buprenorphine products (Suboxone® and Subutex®) for the treatment of narcotic addiction. Both products are high dose (2 mg and 8 mg) sublingual (under the tongue) tablets. Subutex® is a single entity buprenorphine product and Suboxone® is a combination product with buprenorphine and naloxone in a 4:1 ratio. After reviewing the available data and receiving a schedule III recommendation from the Department of Health and Human Services (DHHS), the DEA placed buprenorphine and all products containing buprenorphine into schedule III in 2002.

16

Since 2003, diversion, trafficking and abuse of buprenorphine have become more common in the United States.  In June 2010, FDA approved an extended release transdermal film containing buprenorphine (Butrans®) for the management of moderate to severe chronic pain in patients requiring a continuous, extended period, around-the-clock opioid analgesic for the treatment of opioid addiction by preventing the symptoms of withdrawal for heroin and other opioids.  Based on my training and experience and discussions with other law enforcement personnel, I know that Suboxone is diverted and trafficked, especially into prisons and jails.

### III. **STATEMENT OF PROBABLE CAUSE**

**Background**

16.  PHAM is licensed with the DEA to operate his medical office at Irvine Village Urgent Care, 15435 Jeffrey Road #127, Irvine, California.  PHAM writes controlled substance prescriptions for his "patients" under his DEA license numbers, BP3274254 and XP3274254.  The facts set forth below show that PHAM is intentionally and knowingly prescribing narcotics to "patients" who are both abusing and diverting the obtained pharmaceutical pills.  Furthermore, based on the intercepted letters detailed below, I believe that PHAM is prescribing Suboxone, knowing that it is being smuggled into the jails.

17.  Since 2015, DEA Special Agents and Diversion Investigators in the Riverside and Orange County offices have been conducting an investigation of PHAM for narcotics diversion related offenses.  The investigation has revealed probable cause

to believe that PHAM and several of PHAM's associates are knowingly diverting prescription narcotics, namely oxycodone HCL, hydrocodone bitartrate-acetaminophen, amphetamine salt combo, carisoprodol, tramadol HCL, among other controlled substances.

18.   I was informed by Diversion Investigator ("DI") Daniel Gragg that in July 2015, the DEA Riverside District Office ("RDO") received information that Dr. Dzung PHAM, D.O., DEA number BP3274254, has been prescribing an excessive amount of narcotic controlled substances to patients without a legitimate medical reason.  The RDO Diversion Group conducted an initial investigation into the prescribing habits of PHAM by analyzing the State of California, Department of Justice's Controlled Substance Utilization Review and Evaluation System ("CURES") data and past investigative reports concerning PHAM.  The CURES database lists all scheduled drugs prescribed, including the patient, doctor and pharmacy used for a specific prescription, in addition to the date issued, quantity prescribed and strength of the prescription.  PHAM was identified as prescribing large amounts of controlled substances to patients, many of whom are paying with cash and traveling long distances to see PHAM. Additionally, PHAM is believed to be directing the patients to specific pharmacies to fill the prescriptions, namely Bristol Pharmacy, because certain pharmacies will not fill PHAM's prescriptions.

**Background on Prescribing of and Abuse of Pharmaceutical Pills**

19.   DI Stephanie Kolb is presently employed as a DI for the DEA and has been so employed since 2012.  She has received approximately thirteen weeks of instruction in the investigation of controlled substance registrants (including doctors, physician assistants, and nurse practitioners) and major narcotics traffickers at the DEA Academy in Quantico, Virginia. Over the course of her employment as a DI, she has been the case agent or lead investigator on several federal investigations that have specifically involved the illegal trafficking of pharmaceutical controlled substances by medical doctors, physician assistants, and nurse practitioners, and has participated in multiple other investigations that involved the illegal diversion of pharmaceutical controlled substances.  She has spoken on numerous occasions with pharmacists, physicians, DIs, Medical Board investigators, patients, and other witnesses having extensive knowledge of pharmaceuticals regarding the methods and practices of individuals trafficking in or diverting pharmaceutical controlled substances.  She has participated in the federal prosecution and trials of physicians, physician assistants, and pharmacists.

20.   Based on her training and experience, DI Kolb informed me that individuals on the black market – both drug addicts and drug traffickers – often seek to abuse or sell narcotics such as those listed above in the oxycodone and hydrocodone paragraphs (¶¶ 15a, 15b) combined with drugs including benzodiazepines and muscle relaxants.  Examples of benzodiazepines include

19

alprazolam (brand name Xanax), diazepam (brand name Valium), and clonazepam (brand name Klonopin), each of which are Schedule IV drugs, intended primarily for use in treatment of conditions such as anxiety or insomnia.  The primary muscle relaxant sought on the black market is carisoprodol (Soma), also a Schedule IV drug primarily used for treatment of physiological conditions such as muscle spasms.  Although those drugs are addictive and dangerous even taken alone, the combination of a narcotic with a benzodiazepine and/or a muscle relaxant magnifies the danger of the overall cocktail, and is known among law enforcement to be a major red flag of illicit diversion by medical practitioners such as doctors prescribing and/or pharmacists dispensing such cocktails.  A cocktail of all three categories of drugs (a narcotic, benzodiazepine, and muscle relaxant) is commonly referred to on the black market as the "holy trinity" and is among the most sought-after prescription drug cocktails by addicts and dealers.

**Analysis of PHAM's CURES Reports**

21.  I know having spoken with DI Gragg that in October 2017, Dr. Timothy A. Munzing, M.D., performed a medical expert review of PHAM's CURES reports at the request of DI Gragg.  The following are some of the findings taken directly from Dr. Munzing's expert report:

a.   The CURES database of controlled substance prescriptions written by PHAM for patients between October 2014 and October 2017 was reviewed.  During this timeframe, 52,419 prescriptions and 1,234,507 dosage units were written to

approximately 2,400 unique patients.  This would equate to 334 prescriptions weekly over this 3-year span, assuming no holidays or vacations.  This is an extremely high amount.

b.   64% of these prescriptions were for patients in their 30s to 40s.  This amount of prescribing for this age range is a red flag for abuse/diversion.  Approximately 85% of the opioids prescribed were either oxycodone or hydrocodone. Alprazolam accounted for approximately 68% of the benzodiazepines prescribed.  PHAM's prescribing of controlled substances increased by over 3,000 prescriptions between years 1 and 2 (22% increase) and 3% between years 2 and 3.

c.   Twenty-five patients were selected for a more detailed documented review, based on potential significant areas of concern as far as the prescribing patterns identified.  In fact, many other patients on the CURES database had similar findings and could have been chosen.  After the twenty-five patients were selected, they were further analyzed for the specific patient demographics, and the detailed prescribing specifics by patient and specific drug.

d.   According to the expert report, these twenty-five patients all had concerning findings, including the overall numbers of prescriptions.  Though it is not possible to give a final conclusive opinion as to whether these medications were prescribed for a medically legitimate purpose in the usual course of professional practice (Title 21), based on the findings, and Dr. Munzing's extensive experience reviewing such cases, he found to a very high level of certainty that after

review of the medical records, once obtained if they exist, PHAM failed to meet these requirements in prescribing these dangerous medications.

       e.    PHAM's prescribing patterns are highly suspicious for medication abuse and/or diversion.

       f.    A selection of areas of concern include, but are not limited to:

       i.    Very large number of controlled substance prescriptions written;

       ii.    Frequently multiple dangerous prescriptions prescribed on the same date and concurrently – putting the patient at higher risks for addiction, overdose, and overdose death;

       iii.    Morphine Equivalent Dosing over 100 mg/day – putting patients at higher risk of overdose and overdose death;

       iv.    Early refills for many patients;

       v.    Some patients are using multiple pharmacies to fill their medications, a red flag for abuse/diversion.

       g.    Although twenty-five patients for whom the prescribing patterns were highly suspicious for each one, with multiple red flags for abuse/diversion, these represent only a fraction of the total patients with suspicious prescribing patterns found during the CURES review.

    22.  In October 2018, I requested DI Kolb to review PHAM's current CURES reports.  DI Kolb informed me that she reviewed CURES data for drugs prescribed by PHAM for the approximate time period of January 2018 to September 2018.  DI Kolb's review of

the data showed what she recognized to be red flags reflecting the illicit diversion of controlled substances.

  a. For example, of the approximately 79,736 dosage units for oxycodone in tablet form, approximately 63% (51,226 units) were for maximum strength 30-mg oxycodone.

  b. For example, of the approximately 218,972 dosage units for hydrocodone in tablet form, approximately 95% (209,224 dosage units) were for maximum strength 10-mg hydrocodone.

  c. DI Kolb also observed that PHAM was prescribing large volumes of benzodiazepines.  For example, the CURES data reflects 151,654 total dosage units for alprazolam.  Notably, approximately 78% of these prescriptions (118,992 dosage units) were for 2-mg alprazolam, the maximum strength tablet of the drug available at retail pharmacies, which DI Kolb knows is a drug that even psychiatrists will not ordinarily prescribe for outpatient treatment.  Similarly, of the 22,154 dosage units for diazepam, approximately 78% (16,873 dosage units) are for maximum strength 10-mg.  DI Kolb informed me that to the best of her knowledge, PHAM has no advertised specialty in psychiatry. DI Kolb further informed me that large volumes of benzodiazepines prescribed by a non-psychiatric specialist, particularly when prescribed in combinations with narcotics, is a major red flag of illicit diversion.

  d. The CURES data also shows 71,819 dosage units for carisoprodol (Soma), 100% of those entries are at maximum strength 350-mg.  DI Kolb observed repeated entries throughout the CURES data of patients simultaneously filling PHAM

prescriptions for dangerous combinations, such as combinations
of narcotics with benzodiazepines and/or Soma.

      e.   In addition to the high volume of maximum
strength controlled substances being filled, another red flag DI
Kolb noted is that PHAM patients similar in age reside at the
same addresses of other PHAM patients.  She also noted that
patients are receiving similar medications in combination and
the same dosage unit to patients that are family members or
friends.  This was determined by the address listed on the
prescriptions filled in CURES.  The majority of these patients
are all between the ages of 25 and 40.

**Undercover Visit on June 7, 2018**

   23.  DI Gragg informed me that on June 7, 2018, RDO
conducted an undercover operation at PHAM's office located at
15435 Jeffery Rd, Unit 127, in Irvine, California.  A DEA SA
acted as the undercover agent ("UCA") who entered the business
to attempt to acquire a prescription from PHAM.  The UCA was
equipped with a covert recording device.  The following are the
details of the visit as documented in a DEA report by the UCA:

      a.   At approximately 10:15 a.m., the UCA entered
PHAM's office.  Upon entering the facility, the UCA was greeted
by a female receptionist, and the receptionist asked the reason
for the UCA's visit.  The UCA stated she wanted to discuss an
antibiotic prescription with the doctor.  The receptionist asked
more questions about the UCA's symptoms and the UCA stated she
preferred to discuss that with the doctor.  The receptionist
asked if the UCA was a new patient, to which the UCA confirmed

that she was.  The receptionist asked the UCA to fill out patient information on a tablet on the counter and to fill out a few forms.  Information on the forms requested, among other items: name, date of birth, home address, occupation, allergies, and emergency contact.  Meanwhile, the receptionist asked to make a copy of the UCA's driver license.  After the UCA stated that she did not have insurance, the receptionist told the UCA that the cost of the visit would be $150.00.  The UCA gave the receptionist two $100 bills and asked how long the wait would be, to which she was told "over an hour."  The UCA told the receptionist that she would be back around 12:00 p.m., and the receptionist stated that the UCA's $50.00 in change would be given to her upon her return.  At approximately 10:30 a.m., the UCA departed the doctor's office.

b.   At approximately 12:00 p.m., the UCA returned to PHAM's office.  Upon entering the reception area, the same receptionist from earlier greeted the UCA and gave her $50.00 in return from the earlier cash payment.  At this time, the UCA was called to the back of the facility to be examined.  The UCA was greeted by another female staff member who took the UCA's blood pressure, as well as height and weight.  The staff then escorted the UCA to an examination room to wait for PHAM.

c.   Shortly afterward, PHAM entered the room and greeted the UCA.  PHAM began to question the UCA about a supposed "stomach issue" presented by the UCA and discussed antibiotics.  The UCA and PHAM discussed symptoms in more detail.

25

      d.    Later into the discussion, the UCA presented a "lower back pain" issue and further discussed symptoms with PHAM. PHAM suggested a number of stretching exercises and gave the UCA tip sheets for such exercises. PHAM asked if the UCA had ever received an x-ray exam for her lower back, to which the UCA replied, "No." PHAM asked the UCA to stand upright and commented on the UCA's spinal posture. After further discussion of the UCA's "lower back pain," PHAM pulled out prescription pads and began writing on them. PHAM explained that he recommended a muscle relaxer as well as a sleep aid for the UCA, and wrote prescriptions for both carisoprodol and naproxen. At this time, the UCA asked if PHAM recommended a pharmacy in the local area to get the prescriptions filled. PHAM suggested eLong Pharmacy, located at 15415 Jeffrey Road #108, Irvine, California.

      e.    The UCA reiterated that she needed something to aid the pain of her lower back. PHAM asked if the UCA had used drugs for pain before, to which the UCA stated "Vicodin," and also stated that the Vicodin made the UCA nauseous. PHAM again pulled out his prescription pad and began writing a prescription for hydrocodone. While doing so, PHAM asked if the UCA had gone to a particular pharmacy to fill medications in the past. The UCA stated that she filled prescriptions at CVS Pharmacy. At this time, PHAM paused and explained to the UCA that "CVS will not fill this prescription," motioning toward the writing pad in hand. PHAM stated that the UCA should go to "Bristol Pharmacy"

and talk to "Jennifer."  PHAM stated that he had a business card for Jennifer N.

     f.  At the end of the examination, PHAM walked the UCA out toward the reception desk and handed the UCA two business cards: one for eLong Pharmacy and one for Jennifer N. at Bristol Pharmacy.  At this time, another female receptionist asked to make photo copies of the prescription slips from PHAM. The UCA handed the prescriptions to the receptionist who made the copies and then the UCA received the prescriptions back. Shortly after, the UCA departed the facility.

     g.  At approximately 1:00 p.m., the UCA entered Bristol Pharmacy located at 250 E Yale Loop, Unit C, Irvine, California.  The UCA observed a female behind the counter, whose name tag read "Jennifer [N.]"  The UCA greeted Jennifer and stated that she had just come from PHAM's office.  Jennifer N. then asked the UCA if it was her first time coming to this pharmacy, to which the UCA affirmed.  Jennifer N. looked at the prescriptions and at the UCA's driver license.  When Jennifer N. looked at the written prescription for hydrocodone, she showed the prescription to the UCA and asked if the UCA wanted the "yellow ones," to which the UCA affirmed.  Jennifer N. told the UCA to wait for approximately ten minutes.

     h.  Several minutes later, Jennifer N. called the UCA to the counter and explained to the UCA how to take the prescribed medications.  Jennifer N. opened a bottle which contained the hydrocodone pills, showed the UCA the contents, and then closed the bottle.

i.   It is the UCA's belief that Jennifer N. opened the hydrocodone bottle to show the UCA the yellow color of the pills.  Jennifer N. asked the UCA if she had insurance, to which the UCA stated she did not.  Jennifer N. stated that the total amount due for the prescriptions was $80.00 ($45.00 for the hydrocodone pills and $35 for the remaining prescriptions).  The UCA paid for the medication and departed the pharmacy.

**Undercover Doctor Visit on July 3, 2018**

24.   On July 3, 2018, DEA RDO conducted another undercover operation at PHAM's office located at 15435 Jeffery Road, Unit 127, in Irvine, California.  The same UCA entered the business equipped with two covert recording devices to attempt to acquire a prescription from PHAM.  The following are the details of the visit as documented in a DEA report by the UCA:

a.   At approximately 12:30 p.m., the UCA entered PHAM's medical office in order to complete an undercover office visit with PHAM.  Upon entering the facility, the UCA was greeted by a female receptionist.  The UCA stated that she wanted a refill of prescriptions.  The receptionist stated that the UCA would need to call the office a day prior to refills. The UCA asked if she can be seen by PHAM to discuss other things regarding the medication.  The receptionist asked for which medication the UCA needed a refill.  Initially, the UCA did not discuss the specific medication with the receptionist.  After the receptionist pressed the UCA for a specific medication that needed filling, the UCA stated "Norco."  The receptionist told the UCA that the cost for the visit would be $100.00, at which

time the UCA paid the fee in cash to the receptionist.  The UCA
asked the receptionist if PHAM takes appointments, to which the
receptionist stated that PHAM's office accepts walk-ins only.
The UCA was asked to wait for PHAM to see her.  While waiting,
the receptionist asked the UCA if she previously filled her
prescriptions at "Bristol Pharmacy," to which the UCA said yes.

      b.   At approximately 1:00 p.m., the UCA was called to
the examination room to be seen by PHAM.  Sometime after being
seated in the exam room, PHAM entered the room and greeted the
UCA.  PHAM began to question the UCA about previously prescribed
medications to include the hydrocodone and carisoprodol.  The
UCA stated that she had been taking the muscle relaxer "as
needed," and that a refill for the hydrocodone was needed.  PHAM
asked more questions regarding the UCA's need for further
medication.  During the conversation, PHAM asked if the UCA had
ever received an x-ray for her lower back, to which the UCA
stated, "No."  PHAM suggested that the UCA obtain a lower back
x-ray in order to "justify" the continued prescription of
hydrocodone.  PHAM asked the UCA to stand up and face away from
him.  The UCA stood up, and PHAM pointed to various areas around
the UCA's lower back and asked the UCA to specify troublesome
areas.  After discussing this, PHAM told the UCA that he would
be prescribing a two-month supply of hydrocodone and began
writing in his prescription pad.

      c.   The UCA presented that she had been experiencing
stressful situations that related to her family and she believed
this was triggering the problems with her back area.  PHAM

agreed that high stress can trigger other health problems and noted that the UCA had a high pulse reading.  The UCA further discussed "family issues" with PHAM and stated that she cannot sleep at night.  PHAM initially offered the UCA a sleeping aid, but the UCA stated that the problem is not sleep-related.  PHAM told the UCA that he can prescribe something else, but wanted to make the UCA aware of what is called a "triple threat," when certain medications are combined dangerously, and can cause death if misused.

   d. Having spoken with other investigators and medical experts, I know that a "Triple threat," also referred to as a "Holy Trinity," is the combined use of an opioid (such as hydrocodone), a benzodiazepine (such as Valium), and carisoprodol (a muscle relaxer like Soma).  During the last visit to PHAM by the UCA in June 2018, PHAM prescribed carisoprodol, as well as hydrocodone and naproxen.  During this visit, PHAM prescribed hydrocodone, naproxen, and a benzodiazepine.  After discussing this, PHAM began writing on his prescription pad and recommended a low dose of Valium for the UCA.  PHAM asked where the UCA would get the prescriptions filled, and the UCA stated "Bristol."  Shortly after PHAM wrote the prescriptions, the UCA exited the examination room with the two prescriptions.

   e. The UCA met with a male receptionist outside the exam room, who asked to make photocopies of the UCA's prescriptions.  The UCA observed the receptionist make copies of the two prescriptions before the UCA departed the office.

f.     At approximately 1:41 p.m., the UCA arrived at Bristol Pharmacy, located at 250 E Yale Loop Unit C, Irvine, California.  Upon entering, the UCA recognized Jennifer N. from her previous visit to Bristol Pharmacy on June 7, 2018.  The UCA approached Jennifer N. and stated that she just came from PHAM's office.  Jennifer N. reviewed the UCA's prescriptions and stated that she cannot fill the Valium because the UCA was prescribed 2mg tablets and the pharmacy does not carry those.  Jennifer N. stated that PHAM "usually prescribes 10mg" tablets and that is all the pharmacy has on site.  Afterward, Jennifer N. told the UCA that the other prescription would be filled in approximately 15 minutes.

g.     A short time later, Jennifer N. called the UCA to the counter and opened the bottle containing hydrocodone/"Norco."  The UCA observed that they were large, oval-shaped white pills and asked if she can have the "yellow ones," the same from the previous visit in June.  Jennifer N. stated that the yellow pills cost more.  When the UCA asked how much the yellow Norco pills cost, Jennifer N. stated that the white ones were $1.25 per pill and the yellow ones were $1.75 per pill, and that the order would be approximately $30.00 more. The UCA asked Jennifer N. to exchange the white pills for yellow ones, and Jennifer N. stated it would be done within five minutes.  Shortly after, Jennifer N. showed the UCA the yellow Norco pills.  Jennifer N. told the UCA that the total for the prescriptions would be $113.00, and the UCA paid Jennifer N. in cash and departed the pharmacy.

h.      The UCA noted a difference in price from the
first visit to the second.  During the first visit on June 7,
2018, the UCA paid Bristol Pharmacy $45.00 for 30 tablets of the
yellow hydrocodone pills.  However, during this visit, the UCA
paid $113.00 for 60 tablets of the yellow hydrocodone pills,
which is not consistent with the pricing on June 7, 2018.  In
addition, the UCA paid Bristol Pharmacy $10.00 for 60 tablets of
naproxen on June 7, 2018, but paid Bristol Pharmacy $8.00 for
the same quantity of naproxen during the July visit.

25.  I reviewed the video of the UCA visit and observed
patient files to be on the wall behind the reception desk.  I
also observed a computer located at the reception desk.  There
also appeared to be another computer located in the office area
beyond the waiting room.  DI Hadland informed me that she
observed in the video a computer located in an exam room.  When
the UCA was in the exam room with PHAM, the UCA observed PHAM
writing notes in the UCA's physical patient file.  The UCA also
noted that before the UCA departed PHAM's office, an office
worker took a photocopy of the UCA's prescription.  The
photocopier was located behind the reception desk.

**PHAM's Patients Believed to be Diverting Pharmaceutical Pills**

26.  Orange County Sheriff's Deputy and DEA Task Force
Officer Michael Thalken ("TFO Thalken") has informed me that
E.G., a "patient" of PHAM's, using telephone number 714-xxx-
1255, has been identified on at least two separate occasions as
someone illegally selling pharmaceutical pills.  TFO Thalken
obtained, pursuant to a Grand Jury Subpoena, CURES records

regarding E.G. from January 3, 2018, through June 28, 2018.  An
analysis of E.G.'s CURES report of the scheduled prescriptions
E.G. obtained from January 3, 2018, to June 28, 2018, shows E.G.
obtained thirty-two individual prescriptions on nine separate
dates from Dzung PHAM, D.O., in Irvine, California.  The records
further show E.G. has been obtaining prescriptions for high dose
and large quantities of narcotics- and amphetamine-based
prescriptions.  The CURES records for E.G.'s prescriptions from
PHAM from January 3, 2018, to June 28, 2018, show the following:

    a.    E.G. obtained from PHAM seven separate
prescriptions for 150 pills of 30-mg oxycodone HCL pills,
totaling 1,050 pills of oxycodone HCL, a schedule II controlled
narcotic.  Based on my training and experience, I know oxycodone
HCL is a narcotic-based prescription drug that is highly
addictive and often diverted and abused.  I also know that 30-mg
of oxycodone HCL pills is an extremely high dose and 150 pills
is a very large monthly quantity, both indicative of a high
opioid tolerance from long term use and/or being illegally
diverted to the street.

    b.    E.G. obtained from PHAM seven separate
prescriptions for 150 pills of hydrocodone bitartrate-
acetaminophen 10/325-mg pills, totaling 1,050 pills of
hydrocodone, a schedule II controlled narcotic.  Based on my
training and experience, I know hydrocodone bitartrate-
acetaminophen is a narcotic-based prescription drug that is
highly addictive and often diverted and abused.  I also know
that 10/325 mg of hydrocodone bitartrate-acetaminophen pills is

a high dose and 150 pills is a very large monthly quantity, both
indicative of a high opioid tolerance from long term use and/or
being illegally diverted to the street.

      c.    E.G. obtained from PHAM four separate
prescriptions for 120 pills of tramadol HCL 50-mg pills,
totaling 480 pills of tramadol HCL, a schedule IV controlled
narcotic.  Based on my training and experience, I know tramadol
HCL is a narcotic-based prescription drug that is highly
addictive and often diverted and abused.  I also know that 50-mg
pills is an extremely high dose and 120 pills is a very large
quantity, both indicative of a high opioid tolerance from long
term use and/or being illegally diverted to the street.

      d.    E.G. obtained from PHAM six separate
prescriptions for 90 pills of carisoprodol (Soma) 350-mg pills,
totaling 540 pills of carisoprodol, a schedule IV controlled
depressant.  Soma is a depressant that can produce a euphoria
effect in high doses.  I also know that 350-mg pills is an
extremely high dose and 120 pills is a very large quantity,
indicative of being diverted illegally to the street.

      e.    E.G. obtained from PHAM six separate
prescriptions for 90 pills of dextroamphetamine saccharate,
amphetamine aspartate, dextroamphetamine sulfate, amphetamine
sulfate 30-mg pills, totaling 540 pills of a schedule II
controlled stimulant.  Based on my training and experience, I
know dextroamphetamine saccharate, amphetamine aspartate,
dextroamphetamine sulfate, amphetamine sulfate is a stimulant.
I also know 30-mg is an extremely high dose.  The amounts of

34

pills obtained are indicative of them likely being diverted illegally to the street.

      f.    E.G. obtained from PHAM two separate prescriptions for 180 pills of amphetamine salt combo 30 mg pills, totaling 360 pills of a schedule II controlled stimulant. Based on my training and experience, I know amphetamine salt combo is commonly sold as "Adderall."  I also know 30-mg is an extremely high dose and 120 pills is a very large quantity, indicative of being diverted illegally to the street.

27.  While reviewing CURES reports related to PHAM, TFO Thalken and I discovered another individual, E.S., with a date of birth of May 3, 1982, receiving large quantities of prescriptions from PHAM with the same listed address of record as E.G., 56 Rush Lily, Irvine, California.[2]

28.  Further analysis of the CURES reports related to the prescriptions E.S. received from PHAM from January 3, 2018, through June 28, 2018, shows the following:

      a.    E.S. obtained from PHAM six separate prescriptions for 150 pills of 30-mg oxycodone HCL pills, totaling 900 pills of oxycodone HCL, a schedule II controlled narcotic.

      b.    E.S. obtained from PHAM six separate prescriptions for 150 pills of hydrocodone bitartrate-

---

[2] Based on surveillance and records from Southern California Edison, I know that E.G. and E.S. lived at 56 Rush Lily, Irvine, California, until approximately July 31, 2018, and subsequently moved to Port in Irvine, California, on or about July 31, 2018.

acetaminophen 10/325-mg pills, totaling 900 pills of
hydrocodone, a schedule II controlled narcotic.

      c.    E.S. obtained from PHAM three separate
prescriptions for 150 pills of tramadol HCL 50-mg pills, and two
(2) separate prescriptions for 180 pills of tramadol HCL 50-mg
pills, totaling 810 pills of tramadol HCL, a schedule IV
controlled narcotic.

      d.    E.S. obtained from PHAM six separate
prescriptions for 90 pills of carisoprodol 350-mg pills,
totaling 540 pills of carisoprodol, a schedule IV controlled
depressant.

      e.    E.S. obtained from PHAM three separate
prescriptions for 90 pills of dextroamphetamine saccharate,
amphetamine aspartate, dextroamphetamine sulfate, amphetamine
sulfate 30-mg pills, totaling 270 pills of a schedule II
controlled stimulant.

      f.    E.S. obtained from PHAM three separate
prescriptions for 90 pills of amphetamine salt combo 30-mg
pills, totaling 270 pills of a schedule II controlled stimulant.

    29.   TFO Thalken also conducted other record checks related
to E.G. and E.S., whereby he informed me that there have been
two separate domestic violence incidents between E.G. and E.S.
documented by the Irvine Police Department ("IPD") on February
19, 2016, and May 13, 2016, at 56 Rush Lily, Irvine, California.
On May 13, 2016, IPD arrested E.S. for California Penal Code §
273.5(A) (Inflict Corporal Injury on a Spouse/Cohabitant).
According to the IPD Report from the May 13, 2016, incident,

E.G. stated that she and E.S. have been dating and cohabitating for two and a half years and have a child together.  She also stated that E.S. was a recovering drug addict.

30.  I conducted a toll analysis of PHAM's telephone number, 949-xxx-7044, and E.G.'s number, 714-xxx-1255, and compared the times PHAM and E.GG. exchanged text messages with the days E.G. filled PHAM's prescriptions based on CURES reports.

a.  On July 30, 2018, PHAM and E.G. exchanged four text messages.  On or about July 31, 2018, E.G. filled prescriptions from PHAM for oxycodone HCL, aphetamine salt combo, tramadol HCL, and hydrodone bitartrate-acetominophen.

b.  On August 1, 2018, PHAM and E.G. exchanged six text messages.  On or about August 2, 2018, E.G. filled a prescription from PHAM for carisoprodol.

c.  On August 27, 2018, PHAM and E.G. exchanged twelve text messages, and on August 30, 2018, PHAM and E.G. exchanged four more text messages.  On or about August 30, 2018, E.G. filled prescriptions from PHAM for oxycodone HCL, aphetamine salt combo, tramadol HCL, hydrodone bitartrate-acetominophen, and carisoprodol.

31.  Though E.G. and E.S. obtain similar prescriptions from PHAM, CURES reveals that E.G. and E.S. filled prescriptions from PHAM on different dates.  Since January 2018, E.G. and E.S. have never filled prescriptions from PHAM on the same day.  Based on my training and experience and having spoken with other investigators, I believe the dates on which the prescriptions

37

are filled by E.G. and E.S. may be staggered on purpose to not draw attention to the high volume of narcotics prescriptions that are going to one residence.

32.  Based on my training and experience, the totality of this investigation, and consultation with other law enforcement agents, I believe that based on the drugs that PHAM is prescribing--the "Holy Trinity" or the "Triple Threat"--to E.G. and E.S., who live together, specifically the combination of drugs being prescribed (including the same drugs prescribed to both E.G. and E.S.) during the same timeframe, the high dosage of the drugs, and the large quantity in each prescription, that E.G. is diverting the drugs illegally to the street and illegally distributing controlled substances.

**Intercepted Orange County Jail Communications**

33.  On July 24, 2018, Orange County Sheriff's Department ("OCSD") Investigator Lee provided TFO Thalken with a letter that was found by Santa Ana Police Officer P. Beaumarchais during a traffic stop.  The traffic stop was conducted of known gang members and the letter was located in the vehicle.  Upon reading the letter, Officer Beaumarchais recognized the contents of the letter to contain information regarding narcotics trafficking in the jails.  Officer Beaumarchais seized the letter for further investigation.  As part of the investigation, OCSD Custody Intelligence Unit was notified and alerted to the issues.  Investigator Lee recognized the recipient of the letter to be Lorenzo G., also known as "Lalo".  The author of the letter addressed himself as Lalo's Tio, who Investigator Lee

38

believed to be Natividad G., currently an inmate of the Orange
County Jail.  Below is a transcription of the letter that was
written in English and dated "7/11/18":

     a.    Ay Lalo this is your Tio ok. What this letter
says, can you please call this # & relay everything that I say
in the letter plz? 714-xxx-6696 "Downer" It's on behalf of Frost
& Tio that we said how much $ they have to give you for the
Quarter pound of Window? We now it's 550$ we wanted to know if
you can help us out & if yes how much $ do we have to give you
to make it happen porfay. Also what name do you want us & send
the 100$ for the DR. for the subs?  Give a name to my nephew or
if a hyna will meet up with you to give you the $? Also the Dr
is located @ IRVINE, his name is DR. PHAM! Tell the Dr that you
have a couple gram habit a day & that his wife wants him to stop
so he heard about the new thing called "Suboxin 8mg".  Tell him
to look online for DR. PhAM IRVINE.com #  Then call the Dr & set
the appointment & when he gets there to give the Dr. Personally
the 100$ only the DR. PHAM! The Dr. is supposed to give you 2
priscription For 1 month 90 subs 8mg & the next month as well!
But if he gives you 1 month dont trip get it, even if it's 30,
60, 90 get it plz!  Tell him Frost & Tio sends there [illegible]
we got him on $ a extra for all his help! Spenga that we don't
really got that much $ but you know what happened [illegible]
were here with us in L! Tell Julio those [illegible] # plz!
Also the 2 individuals that are suppose to help out is my
brother & [illegible]!  Let's make this happen & make all of us
$.  Gracias for your help & stay up!  Call Grinch 714-xxx-1064 &

tell him if he can give you the oz of window to you Downer & if you can hold it plz?  Gracias [illegible]. PS. LALO you can take a picture of it & send it to him or call him & Read it to him plz!  Also we haven't forgot about you. If this goes good we got you dont trip!  Also send me the baby pictures plz! Take care & stay up & God Bless you & Love you!  Your Tio!

34.  Based on my training, knowledge, experience, and having spoken with other investigators, I believe Natividad G. is asking "Lalo" to obtain Suboxone from PHAM for the purpose of smuggling the Suboxone into jail.  Furthermore, I believe PHAM likely knows that the Suboxone is going into the jails when Natividad G. tells Lalo to tell PHAM "Frost & Tio sends there [illegible]" and they "got him on $ a extra for all his help."

35.  Investigator Lee informed TFO Thalken and me that Suboxone is currently one of the most trafficked narcotics in the Orange County Jail system with strips of Suboxone being sold for $100-$150 each.

36.  On or about August 1, 2018, TFO Thalken and I were also made aware of intercepted jail communications, also called "kites," that were seized at the Theo Lacy jail facility in Orange County, California.  Investigator Lee provided TFO Thalken with the report referring to the intercepted kites from an Orange County Jail inmate that mentioned using PHAM to obtain Suboxone and Xanax that could be smuggled into the jail and for the inmate to distribute and sell the drugs in the jail.

**Interview of CVS Pharmacist on September 27, 2018**

37.   On September 27, 2018, DI Kolb and I interviewed a pharmacist at the CVS Pharmacy located within Target at 3750 Barranca Parkway, Irvine, CA 92606.  The pharmacist stated that she and the other pharmacists decided to stop accepting PHAM's prescriptions for opiates approximately five years ago.

38.   She stated that many of the patients coming in with prescriptions from PHAM were very young in age and would often pay cash for their prescriptions.  She also mentioned that the amount of opiates being prescribed was significant and excessive.  She mentioned that she would see prescriptions for 120 10-mg Norcos.  She stated that she and the other pharmacists would call PHAM's office and inquire why there were so many opiates being prescribed and would ask him what his diagnosis was for the patient for whom he was prescribing large amounts of opiates.  She indicated his explanations were insufficient so she and her co-workers decided to stop accepting his prescriptions.

39.   She also said that when that pharmacy became a CVS pharmacy around December 2015, she and her co-workers were made aware that CVS as a company had stopped accepting PHAM's prescriptions.

**Interview of Spouses of PHAM's Patients on October 16, 2018**

40.   On October 16, 2018, California Medical Board Investigator Amber Driscoll and I interviewed R.C. to discuss her complaint to the Medical Board of California regarding PHAM. The following is a summary of the interview:

41

a.    R.C. stated that her husband, T.C., struggles
with an opioid addiction and is currently a patient of PHAM's.
He is also currently under the care of a primary care physician
through their medical insurance.  He is also seeing a
psychiatrist for the treatment of addiction.  The psychiatrist
is prescribing buprenorphine (Suboxone) and anti-depressants.

b.    She stated that she believed T.C. called PHAM two
weeks prior for a Suboxone prescription.  PHAM now bills the
visits through their insurance.  Previously, T.C. would try to
hide the fact that he was going to PHAM, so he would pay cash.
When the money ran out, he started using the insurance.  When
T.C. was going on a regular basis to PHAM, he would go as often
as every two to three weeks.

c.    R.C. said that T.C. would get prescriptions for
Suboxone and oxycodone filled at the same pharmacy.  In April
2017, T.C. was hospitalized for Xanax withdrawal seizures.  He
was in the hospital for one week.  At that time, one of the
physicians told her that he ran a report (CURES) for T.C. and
that PHAM was prescribing a dangerous amount of drugs to T.C.
and suggested that she should report PHAM to the Medical Board.
T.C. was taking six to eight oxycodone and Xanax at the same
time on a daily basis.

d.    R.C. stated she and T.C. have been together for
ten years and she thinks he became addicted to oxycodone and
Xanax in 2013.  She became aware of PHAM prescribing to T.C. in
2017.  She does not know how T.C. started seeing or initially
heard of PHAM, but she believes it was simply through the

42

grapevine.  She stated T.C.'s addiction has gotten significantly worse over the last two years.

e.   When asked if she had ever been to PHAM's office, she said no.  She has never been to PHAM's office with her husband or as a patient.  When asked if she thought her husband would ever use her driver's license to obtain a prescription, she said she did not know.  She stated she has found her driver's license in his wallet before, and there was no reason for him to have it.

f.   R.C. stated that on December 25, 2017, T.C. entered a VA rehabilitation facility and was released in February 2018.  She stated that T.C. told PHAM he had been in rehab; however, R.C. found prescriptions written by PHAM after that time.  In May 2018, T.C. went to rehab again.  She stated that T.C. told her a few weeks ago that PHAM would not prescribe to him anymore, except for Suboxone and anti-inflammatories, because PHAM knows he is an addict.  He also told her PHAM would not prescribe to him anymore after he completed rehab in February 2018.

g.   R.C. stated that T.C. usually goes to HV Pharmacy or Tower Pharmacy.  T.C. told her that HV Pharmacy has an agreement with PHAM, so PHAM can call in prescriptions because PHAM knows the pharmacist and can call her to fill prescriptions.

h.   I conducted a review of CURES and found three prescriptions in R.C.'s name prescribed by PHAM, which were

filled on the following dates for the following controlled substances and the number of pills:

```
2018-08-04    R.C  OXYCODONE HCL  30 MG    30
2018-08-20    R.C. DIAZEPAM       10 MG    30
2018-08-27    R.C. OXYCODONE HCL  30 MG    45
```

      i.    Per CURES, T.C. also received a prescription of Oxycodone from PHAM on August 6th, 14th, 30th, and on September 4th of 2018.  Furthermore, on September 7 of 2018, PHAM wrote T.C. a prescription for buprenorphine hydrochloride (Suboxone).

      j.    Based on our interview of R.C. who stated she has never seen PHAM as a patient, in conjunction with the CURES report, Investigator Driscoll and I believe PHAM prescribed oxycodone for T.C. in R.C.'s name in order to give T.C. extra oxycodone prescriptions.  As a result, I believe PHAM illegally distributed controlled substances, specifically oxycodone HCL 30mg, a Schedule II narcotic controlled substance, to T.C., in the name of R.C., on August 4, 2018, and August 27, 2018, in violation of 21 U.S.C. § 841(a)(1).

41.  On October 16, 2018, Investigator Driscoll and I interviewed M.K. to discuss her complaint to the Medical Board of California regarding PHAM.  The following is a summary of the interview:

      a.    M.K. stated she has been separated from her husband, A.K., since January 2018 due to his long-time addiction.  She stated A.K. completed a 28-day rehab program three weeks ago.

      b.    She stated they have been together since 2010, at which time A.K. was completing a court-ordered rehab.  She

stated his addiction to prescription pills began after high school. A year after they started dating, she noticed A.K.'s behavior changed and she could tell he was under the influence of prescription pills.

       c.    She became aware of PHAM when she found prescription bottles for A.K. strewn about their house. Sometimes, she would even find random pills on the ground. In 2013, she told A.K. that she wanted to talk to PHAM. She and A.K. went together to talk to PHAM. PHAM seemed concerned about the pills A.K. was taking. PHAM knew A.K. had been to rehab for opioid addiction and M.K. said that he acted as if he wanted to help. PHAM had a report of all the medications he had prescribed to A.K. and told her he did not know how A.K. was finishing the medications so fast. PHAM told them he would prescribe something so A.K. would be able to wean off the drugs, but M.K. could not recall the name of the medication. For the first few days, she would hand A.K. the pill when he was supposed to take it. After that, she gave the prescription to him to take on his own. M.K. described PHAM's waiting room as full of addicts.

       d.    A.K. told her that some of the pharmacies do not fill PHAM's prescriptions. Approximately three to four months after speaking with PHAM, M.K. found pills on the floor again. Over the years, they tried to talk it out. A.K. again went to an outpatient rehab treatment, but would eventually relapse.

       e.    In January 2017, M.K. asked A.K. to move out of the house. He went to another outpatient rehab program and

changed jobs.  In May 2017, she allowed him to return to the
house.  In August 2017, she again found prescription pills for
opioids prescribed by PHAM.  In frustration, she reached out to
A.K.'s mother and sister.  She stated that A.K.'s sister, T.K.,
is a nurse and soon thereafter called PHAM and asked him why he
was prescribing opioids to A.K.  M.K. stated the last four
months of 2017 were very difficult as A.K., a jeweler by trade,
could not function at work.

      f.    On December 25, 2017, she stated that A.K. was so
negatively affected by the opioids that he could barely open a
Christmas present from his son.  M.K. recorded the incident and
played the recording for us, at which time we observed A.K. in
an almost catatonic state.  He had a hard time lifting his hands
and was audibly slurring his words.

      g.    On that same day, M.K. called A.K.'s mother and
sister to come over and take care of him.  His mom went into his
car and found a backpack with ten different prescription
bottles, all dated very close together and all prescribed by
PHAM.  M.K. sent PHAM a text message and told him that if he
continued to prescribe to A.K. that PHAM would be in very big
trouble.  PHAM did not respond to her text.  A.K. went to PHAM
after that and told her PHAM refused to prescribe anything to
him.

      h.    M.K. stated A.K. has been seeing PHAM for at
least 15 years and that his addiction has been an on-going
cycle.  She thinks PHAM charged $100 per visit and accepts cash.
She believed A.K. went to PHAM at least once a week.

      i.    M.K. described A.K.'s relationship with PHAM as a friendship.  They would text message and talk on the cell phone on a regular basis.  At one point, PHAM was trying to get A.K. to help open a marijuana dispensary, but that plan did not materialize.

      j.    A.K.'s favorite pharmacy was Bristol Pharmacy. There was an Asian pharmacist at the location, but M.K. does not know her name.  Based on my knowledge of the investigation and as corroborated by UCA's visit to PHAM's office, I believe the pharmacist is Jennifer N.

**Toll Analysis of PHAM's Text Messages**

42.  Intelligence Analyst ("IA") Julie Banner and I conducted a toll analysis of PHAM's text messages from PHAM's telephone number, 949-xxx-7044.

43.  From July 6, 2018, to September 11, 2018, PHAM's telephone number was in contact with 24 telephone numbers that either were or are actively being investigated by the DEA and other law enforcement agencies.  The following two examples are of note, as they summarize the current criminal activity involved in each investigation:

      a.    Based on a common call analysis, using toll records with a date range between 07/17/2018 and 08/30/2018, PHAM's telephone was in text message contact with E.G.'s telephone, 714-xxx-1255, approximately 31 times.

      b.    PHAM's telephone number was in text message contact with phone number 909-xxx-1166 on 13 occasions from July 14, 2018, through August 23, 2018.  Per open source information,

the subscriber of 909-xxx-1166 is J.H., an opioid addict and patient of PHAM's per CURES.  J.H.'s telephone number is in contact with 714-xxx-0454, which is believed to be used by K.E. I spoke with DEA SA Lindsay Burns, who informed me that K.E. is believed to be a Southern California courier and distributor of oxycodone and other narcotics per an active DEA investigation.

**Result of the First Search Warrant served for PHAM's Text Messages**

44.  On October 24, 2018, the Honorable Douglas F. McCormick, United States Magistrate Judge, signed a warrant to obtain historical text messages from PHAM's Verizon Wireless cellular telephone, 949-xxx-7044.  On the same day, I served the warrant on Verizon Wireless.

45.  On October 25, 2018, I downloaded the response packet from Verizon Wireless, which included text messages for the period of September 13, 2018, to October 24, 2018.  The following is a text message exchange between from PHAM's Verizon Wireless cellular telephone number and E.G. on October 5, 2018: ---------------Text Message for date/time - 2018-10-05T18:17:24.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

Hi dr Pham,

I know [E.S.] came to you. Our pain management wants all of our accident records and its taking

forever. Im a week past due for scripts. Can you write for me please??


----------Text Message for date/time - 2018-10-05T18:17:34.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

[E.G.] 4/27/84

Roxicodone 30mg 150

Hydrocodone 10mg 150

Adderall 30mg 90

Lexapro 20mg 30

Tramadol 50mg 120 - CAN WE DO LONG ACTING TRAMADOL PLS.

Thank you


---------------Text Message for date/time- 2018-10-05T18:17:42.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

 Please lmk ASAP

---------------Text Message for date/time - 2018-10-

05T18:51:26.000Z---------------

Message Subject:

Source Address: 949xxx7044

Destinations: [714xxx1255]

Message Contents

 Ok it is ready


---------------Text Message for date/time - 2018-10-

05T19:57:21.000Z---------------

Message Subject:

Source Address: 714xxx1255

Destinations: [949xxx7044]

Message Contents

 Thank you!!

    46.   On November 9, 2018, I reviewed the CURES report for
PHAM and found that on October 5, 2018, the same date as the
text messages above between PHAM and E.G., E.G. filled the
following four prescriptions written by PHAM:

| Drug Name | Form | Strength | Qty | Days Supply |
|---|---|---|---|---|
| AMPHETAMINE SALT COMBO | TAB | 30 MG | 90 | 30 |
| ACETAMINOPHEN-HYDROCODONE BITARTRAT | TAB | 10/325 MG | 150 | 25 |
| OXYCODONE HCL | TAB | 30 MG | 150 | 25 |
| TRAMADOL HCL | TER | 100 MG | 30 | 30 |

And on October 8, 2018, E.G. filled the following prescription written by PHAM:

| Drug Name | Form | Strength | Qty | Days Supply |
|-----------|------|----------|-----|-------------|
| CARISOPRODOL | TAB | 350 MG | 90 | 30 |

47. Based on my training, experience, and knowledge of this investigation, I believe PHAM is exchanging text messages with E.G.. I believe E.G. is referring to her boyfriend, E.S., who is also a patient of PHAM's. Furthermore, I believe that E.G. asked PHAM to refill her prescriptions via text message and told PHAM the quantity of pills that she wanted, which are the numbers following the strength of the pills. Based on the timeframe of the exchanged messages, including PHAM's response that the prescriptions are "ready" within 35 minutes of E.G.'s requests, I believe PHAM likely wrote the prescriptions without seeing E.G. in person to provide an examination.

48. Based on my knowledge of this investigation and having spoken with other medical physicians and investigators, I believe that it is highly uncommon and suspect for a medical professional to be communicating with his or her patients via text message at the frequency with which PHAM and E.G. have been communicating.

**Result of the Second Search Warrant served for PHAM's Text Messages**

49. On November 13, 2018, United States Magistrate Judge McCormick signed another warrant to obtain historical text messages from PHAM's Verizon Wireless cellular telephone, 949-

xxx-7044. On the same day, I served the warrant on Verizon Wireless.

50.  On November 15, 2018, I downloaded the response packet from Verizon Wireless, which included text messages for the period of October 30, 2018, at 9:25 a.m. through November 13, 2018, at 10:44 p.m.

51.  The following is a text message exchange that occurred on  November 6, 2018, between PHAM's Verizon Wireless telephone number and telephone number, 949-xxx-6809, which based on an open source check, I believe belongs to D.N., a patient of PHAM's:

---------------Text Message for date/time - 2018-11-06T20:42:41.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐Dr. Pham you wrote [G.P.]'s Norco for only quantity of 120 and I change it to an eight so it says 180 so he calls and confirms right now can you confirm that you wrote a prescription for 180 quantity Norco [G.P.]

---------------Text Message for date/time - 2018-11-06T20:43:19.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐[G.P.] norco was for 180


---------------Text Message for date/time - 2018-11-06T20:43:31.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message

 Contents They might call you


---------------Text Message for date/time - 2018-11-06T20:43:45.000Z---------------

Message Subject:☐

Source Address: 949xxx7044☐

Destinations: [949xxx6809]

Message Contents

☐I do not agree to give [G.P.] 180 norco. He should be on 120 only

```
---------------Text Message for date/time - 2018-11-
06T20:44:19.000Z---------------
```

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]☐

Message Contents

☐You have been giving him 180 the whole time


```
---------------Text Message for date/time - 2018-11-
06T20:44:30.000Z---------------
```

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

 Some are for me

```
---------------Text Message for date/time - 2018-11-
06T20:44:49.000Z---------------
```

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐Can I bring these two back and get them for 180 please

---------------Text Message for date/time - 2018-11-
06T20:45:34.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

  It's always been 180


---------------Text Message for date/time - 2018-11-
06T20:45:47.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

  We truly need them


---------------Text Message for date/time - 2018-11-
06T20:46:58.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐Can I I please come back and get scripts for 180

---------------Text Message for date/time - 2018-11-
06T20:47:05.000Z---------------

Message Subject:☐

Source Address: 949xxx7044☐

Destinations: [949xxx6809]

Message Contents

 Ok


---------------Text Message for date/time - 2018-11-
06T20:47:29.000Z---------------

Message Subject:☐

Source Address: 949xxx6809

Destinations: [949xxx7044]☐

Message Contents

☐Thank you. Will be back later. Taking mom to an eye appointment


---------------Text Message for date/time - 2018-11-
06T20:49:43.000Z---------------

Message Subject:☐

Source Address: 949xxx7044☐

Destinations: [949xxx6809]

Message Contents

☐FYI, I will charge [G.P.] 140 for the two month supplies for
norco.

---------------Text Message for date/time - 2018-11-06T20:50:19.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

  Can we do $

---------------Text Message for date/time - 2018-11-06T20:50:23.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents 120

---------------Text Message for date/time - 2018-11-06T20:51:20.000Z---------------

Message Subject:☐

Source Address: 949xxx7044☐

Destinations: [949xxx6809]

Message Contents

  Fine.

```
---------------Text Message for date/time - 2018-11-
06T20:51:59.000Z---------------
```

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐I don't have any cash on me right now after paying your office
visit and the 60 I gave you can we
start that next time

```
---------------Text Message for date/time - 2018-11-
06T20:52:27.000Z---------------
```

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐I will come back at 3 o'clock to see you and just to let you
know [G.P.] is one of the investors I have in your oil once you
get a plan together

```
---------------Text Message for date/time - 2018-11-
06T20:53:06.000Z---------------
```

Message Subject:☐

Source Address: 949xxx7044☐

Destinations: [949xxx6809]

Message Contents

 Ok☐Good to know

---------------Text Message for date/time - 2018-11-
06T20:54:00.000Z---------------

Message Subject:□

Source Address: 949xxx6809□

Destinations: [949xxx7044]

Message Contents

□He is also the CEO of a public company


---------------Text Message for date/time - 2018-11-
06T20:55:00.000Z---------------

Message Subject:□

Source Address: 949xxx6809□

Destinations: [949xxx7044]

Message Contents

□Since we keep [G.P.] separate from your office staff do you
want to just come out and meet me when I get to your office or
do you want me to act like you need to come back and talk to you
in your office for something

---------------Text Message for date/time - 2018-11-
06T20:56:23.000Z---------------

Message Subject:□

Source Address: 949xxx6809□

Destinations: [949xxx7044]

Message Contents

□They did see his prescriptions. They didn't photo copy his.
They never have

---------------Text Message for date/time - 2018-11-06T20:57:07.000Z---------------

Message Subject:☐

Source Address: 949xxx7044☐

Destinations: [949xxx6809]

Message Contents

☐Text me whenever you are in the back of my office, door #127.

---------------Text Message for date/time - 2018-11-06T20:57:12.000Z---------------

Message Subject:☐

Source Address: 949xxx6809☐

Destinations: [949xxx7044]

Message Contents

☐You kept his file private in your personal affects

---------------Text Message for date/time - 2018-11-06T20:57:13.000Z---------------

Message Subject:☐

Source Address: 949xxx6809

Destinations: [949xxx7044]

Message Contents

☐Ok

52.  On December 1, 2018, I reviewed the CURES report for PHAM and found that on November 6, 2018, the same date as the

above text messages, G.P. filled the following two prescriptions
written by PHAM:

| Drug Name | Form | Strength | Qty |
|-----------|------|----------|-----|
| ALPRAZOLAM | TAB | 2 MG | 90 |
| HYDROCODONE BITARTRATE-ACETAMINOPHE | TAB | 325 MG-10 MG | 180 |

53.   Based on my training, experience, and knowledge of
this investigation, I believe D.N. texted PHAM and asked PHAM to
write a prescription for 180 "norcos", or hydrocodone pills, for
another person by the name of G.P.  Furthermore, I believe that
PHAM knew at least some of the hydrocodone pills obtained from
PHAM's prescription would be used by someone other than G.P. --
*i.e.*, the user of telephone number 949-xxx-6809, as D.N.
indicated he was using some of G.P.'s prescriptions for himself.
D.N. also verified that PHAM would keep the file for G.P. in
PHAM's personal effects.

54.   The following is a text message exchange that occurred
on November 7, 2018, between PHAM's Verizon Wireless telephone
number and telephone number 803-xxx-0091, which based on an open
source check, and information included in the text messages, I
believe belongs to C.K., a patient of PHAM's:

---------------Text Message for date/time - 2018-11-
07T02:04:47.000Z---------------
Message Subject:□
Source Address: 803xxx0091□
Destinations: [949xxx7044]
Message Contents

I'm home now thank you for everything I am just super sleepy and just feel little bloated that's all. Going back to sleep now. Love you. Are you coming over tomorrow morning? Obviously I can't have sex, but we don't have any groceries and I can make $150 off of Dino's prescription For getting it for him, and I'm almost out of my alprazolam I think, we can look at it tomorrow if you don't mind. I'm kind of seeing blurry right now and hoping this is coming out right. I love you

---------------Text Message for date/time - 2018-11-07T02:24:19.000Z---------------
Message Subject:
Source Address: 949xxx7044
Destinations: [803xxx0091]
Message Contents
Ok Just rest. I will deposit 300 into your account tonight.

---------------Text Message for date/time - 2018-11-07T02:32:11.000Z---------------
Message Subject:
Source Address: 803xxx0091
Destinations: [949xxx7044]
Message Contents
I still wanted to spend time with you tomorrow we don't have to have sex, or you could just go down on me! They went in through my bellybutton and made small three incisions right above my pubic bone so I'd love for someone to stimulate my clitoral

hood! I would also like to get Dino's prescription for him,
Because everything helps. Can I please have an orgasm tomorrow?
Or all of this shit would've been for nothing. Am I making
sense, I feel great just a little bloated.

---------------Text Message for date/time - 2018-11-
07T03:14:51.000Z---------------
Message Subject:□
Source Address: 949xxx7044□
Destinations: [803xxx0091]
Message Contents
□Your request is my command

    55.  On December 1, 2018, I reviewed the CURES report for
PHAM and found that on November 9, 2018, two days after the
above text conversations, Dino B., the only patient identified
with the first name of "Dino" in a two month CURES report for
PHAM ranging from October to November 2018, filled the following
prescription written by PHAM:

| Drug Name | Form | Strength | Qty |
|---|---|---|---|
| AMPHETAMINE SALT COMBO | TAB | 30 MG | 90 |

    56.  Based on my training, experience, and knowledge of
this investigation, I believe the above text messages references
that PHAM is writing prescriptions that he knows will be sold
for cash when the user of telephone number 803-xxx-0091 writes,
"I can make $150 off of Dino's prescription For getting it for
him… I would also like to get Dino's prescription for him,
Because everything helps."

57.  Based on my knowledge of this investigation, having reviewed PHAM's text messages, and having conducted an open source search, I believe the user of telephone number, 803-XXX-0091, is PHAM's patient, C.K.  I also believe based on having read the text messages and comparing listed addresses on CURES that C.K. has a daughter with the initials of A.K, who is approximately 9 years old.  Having reviewed PHAM's CURES reports, I know that PHAM is also prescribing medications for both C.K. and her daughter, A.K.  Further troubling from a review of the text messages is PHAM appears to be having an intimate relationship with his patient, C.K., to whom PHAM is also prescribing controlled substances.

58.  The following is a text message exchange that occurred on or about November 9, 2018, between PHAM's Verizon Wireless telephone number and telephone number, 931-xxx-2329, which based on open source records and my knowledge of this investigation, I believe to be used by PHAM's patient T.C., discussed above:

---------------Text Message for date/time - 2018-11-09T23:54:56.000Z---------------

Message Subject:□

Source Address: 949xxx7044□

Destinations: [931xxx2329]

Message Contents

□Hi [patient's name]□One of my patient just told me that the thousand oak shooter, ian david long, had my prescription bottles that belong to some else. I never saw Mr. Long before, so i dont know the implication of

this information.

---------------Text Message for date/time - 2018-11-
10T00:01:06.000Z---------------

Message Subject:☐

Source Address: 931xxx2329☐

Destinations: [949xxx7044]

Message Contents

☐Ill get [my wife] on it, if its not his prescriptions you are
clear ok, dont worry...do you know who the person was that had
the original script? But thats not on you, if i give my meds to
some crazy person its on me, not you, you have no control over
what happened after a patient leaves your office ok..but i will
ask [my wife] to clarify.

59.  Based on my training, experience, knowledge of this
investigation, and having reviewed PHAM's text messages, I
believe PHAM is texting a patient of his to express concern that
Ian David Long, the individual who shot and killed twelve people
in Thousand Oaks, California, on November 7, 2018, had in his
possession prescriptions written by PHAM.  Though it is unclear
as for whom the prescriptions were written, PHAM's text message
reveals the possibility that PHAM knew his prescriptions could
have been diverted and used by other individuals.

**Summary of the Troublesome Findings within PHAM's Text Messages**

60.  After reviewing the results of the first and second
search warrants for PHAM's text messages, I observed the
following red flags:

a.     From September 13, 2018, to October 2, 2018, over 100 different patients texted PHAM to refill their prescriptions, often times dictating to PHAM what they wanted, to include the type and quantity of drug.  Per CURES, at least 84 of those patients had their prescriptions filled on the same day or within the next two days of their text messages.  The drugs requested include, but are not limited to, adderall, oxycodone, tramadol, suboxone, norco, soma, alprazolam, and hydrocodone bitartrate-acetaminophen.

b.     Several of PHAM's patients sent PHAM texts requesting "Roxy's," which I know is a commonly used street slang for Roxicodone, a brand name for oxycodone.  One text in particular, sent by patient S.C. on November 5, 2018, states, "hi dr pham, can you please have my script ready for pick up...90 roxy, and 60 xanax, thank you...[patient's first name]." On November 9, 2018, patient S.C. filled PHAM's prescription for Alprazolam 2 mg quantity 60 and for Oxycodone HCL 30 mg quantity 90.

c.     These are a summary of the text messages and do not purport to identify all of the illicit activities suggested within the text messages.

**Financial Analysis of PHAM's Banking Activities**

61.  On November 8, 2018, DEA Senior Financial Investigator Dennis Packer provided me with the below information regarding the banking activities of PHAM.

a.     PHAM and his wife have nine bank accounts between them at East West Bank ("EWB") and PHAM has one account at Wells

Fargo Bank ("WFB").  Between 2013 and September 2018, PHAM, dba
IRVINE VILLAGE URGENT CARE, deposited over $5 million, the bulk
of which was cash deposits, primarily in accounts at EWB, but
also at WFB from 2016 through 2018.  PHAM sometimes structured
his cash deposits to avoid the currency transaction reporting
requirement, and typically would withdraw or transfer his funds
soon after depositing them.

      b.    PHAM also maintained a business banking account
in which the majority of the deposits were checks from various
health care providers, which PHAM used the funds to pay personal
expenses directly from the account.  PHAM also had a merchant
account for his business in which PHAM deposited approximately
$1.7 million from 2013 through 2018.

    62.  Per a review of Registrant Information Consolidated
System, in February of 2018, PHAM applied to the Center for
Substance Abuse Treatment to increase his opioid addiction
treatment to the maximum of 275 patients from 100 patients.

    63.  I reviewed CURES reports for four days ranging from
the months of January through June 2018.  The following is what
I discovered after reviewing CURES:

      a.    On January 31, 2018, approximately 21 patients of
PHAM filled prescriptions, one of which was a prescription for
buprenorphine.

      b.    On March 13, 2018, approximately 40 patients of
PHAM filled prescriptions, three of which were prescriptions for
buprenorphine.

     c.    On April 26, 2018, approximately 45 patients of PHAM filled prescriptions, eight of which were prescriptions for buprenorphine.

     d.    On June 5, 2018, approximately 55 patients of PHAM filled prescriptions, nine of which were prescriptions for buprenorphine.

66.  I know based on my knowledge of this investigation, reviewing PHAM's text messages and reviewing UCA reports that PHAM charges anywhere between $100 and $150 for prescriptions and/or office visits.  Based on the increase in the number of prescriptions being filled from January to June 2018 to include buprenorphine prescriptions, I believe PHAM requested the increase of patients from CSAT in order to make more money from patients either requesting prescriptions or visiting his doctor's office.

**Overdose Deaths & DUI Investigations Involving PHAM**

65.  Based on records I received from the Orange County Sheriff-Coroner Division, I have learned of five victims (A.M.B-C., M.B.F., S.L.S., B.W.T., and S.C.V.) who have overdosed and died who were also receiving and filling prescriptions from PHAM from 2014 to 2017.

     a.    One victim, a 46 year old male, B.W.T., overdosed from acute alprazolam, hydrocodone, trazodone, and hydroxyzine intoxication in November 2014.

     b.    One victim, a 21 year old male, S.L.S., overdosed from an acute polydrug intoxication of heroin, buprenorphine and alprazolam on August 30, 2015.  Per CURES, S.L.S. filled the

following prescriptions from PHAM:

       Alprazolam 2 mg, quantity 30, filled on 8/17/15

       Suboxone, 8 mg-2 mg, quantity 90, filled on 8/19/15

       Zubsolv 5.7 mg-1.4 mg, quantity 15, filled on 8/19/15

       Alprazolam 2 mg, quantity 60, filled on 8/28/15

In the report, the victim's mother referred to PHAM as "Dr. Feel-good."

    66. On November 3, 2018, at approximately 8:00 a.m., S.T.S., a patient of PHAM's, struck and killed a Costa Mesa Fire and Rescue Captain. I know having spoken with OCSD Investigator Shane Stewart that S.T.S. told investigators in his post-arrest interview that S.T.S. was on medications prescribed by PHAM. Investigator Stewart also informed me that in S.T.S.'s vehicle were several prescription bottles for S.T.S. that were prescribed by PHAM. In reviewing PHAM's CURES report, I observed that on or about October 31, 2018, S.T.S. filled the following prescriptions from PHAM:

| LORAZEPAM | TAB 2 MG | 60 |
| AMPHETAMINE SALT COMBO | TAB 30 MG | 60 |
| SUBOXONE | FIL 8 MG-2 MG | 90 |

    67. Furthermore, in a review of search warrant returns of PHAM's text messages, I observed a text message from D.L. that was sent to PHAM on September 24, 2018. In the text message, D.L. wrote: "Hi doctor Pham it's [D.L.]. U told to find another doctor because my brother past away but I can't get any or find any doctors that'll give me a benzo...since he died I have really bad attacks I never knew a pannick attack till that

happened. My mom has to give me a Ativan sometimes...I was gonna
ask you if you can please help me? I don't need even half of
what u used to you used to give me...can I please start seeing
you again??"

      a.     Based my training, experience, and knowledge of
this investigation, I believe D.L. is texting PHAM to obtain
benzodiazepines.  I also believe D.L. is telling PHAM that other
doctors will not prescribe to D.L. what PHAM prescribed, and
that PHAM turned D.L. away as a patient after the death of
D.L.'s brother.

      b.     I reviewed CURES reports and observed that PHAM
prescribed to both D.L. and to R.L., who is similar in age and
shared the same address as D.L.  Based on an open source search,
I believe R.L. died on or about March 9, 2018, and R.L. and D.L.
are brothers.  In reviewing PHAM's CURES report, I observed that
on or about March 5, 2018, R.L. filled the following
prescriptions from PHAM:

| | | | |
|---|---|---|---|
| LORAZEPAM | TAB 1 MG | 28 | |
| DIAZEPAM | TAB 2 MG | 28 | |

      c.     I have since reached out to the Orange County
Sheriff-Coroner Division to inquire about death of R.L.

## IV. CONCLUSION

68.   For all the reasons described above, I respectfully submit that there is probable cause to believe that PHAM has committed violations of Title 21, United States Code, Section 841(a)(1), Distribution of a Controlled Substance - Oxycodone, a Schedule II narcotic controlled substance.


_____|S|_____
Lindsey Bellomy
SPECIAL AGENT


Subscribed to and sworn before me
this __)⁊__ day of December, 2018.


_____AUTUMN D. SPAETH_____
THE HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE